NATIONAL FARMERS
ORGANIZATION,
IRASBURG

v.

COMMISSIONER OF AGRICULTURE,
STATE OF CONNECTICUT.

Civ. No. H 76–457.

United States District Court,
D. Connecticut.

July 22, 1980.

Peter F. Langrock, Langrock, Sperry, Parker & Stahl, Middlebury, Vt., for plaintiff.

Richard F. Webb, Asst. Atty. Gen., Carl R. Ajello, Atty. Gen., Hartford, Conn., for defendant.

## MEMORANDUM OF DECISION

JOSÉ A. CABRANES, District Judge:

### INTRODUCTION

This case is a commerce clause challenge to the statutory scheme which empowers the Connecticut Commissioner of Agriculture to register and inspect both local and out-of-state dairy farms before milk originating at those farms may be sold in Connecticut. "The milk industry," as Justice Frankfurter long ago observed, "is peculiarly. subject to internecine warfare," *H. P. Hood & Sons v. Du Mond*, 336 U.S. 525, 572, 69 S.Ct. 657, 673, 93 L.Ed. 865 (1949) (Frankfurter, J., dissenting), and this latest case raises some of the issues that repeatedly have provoked litigation in the federal courts.[1]

Plaintiff National Farmers Organization, Irasburg ("NFO") is a milk handler and association, duly licensed by the State of Vermont, consisting of approximately fifty dairy farms located in Orleans County, Ver-

---

1. Major milk cases to come before the Supreme Court during the last fifty years include *Baldwin v. G. A. F. Seelig, Inc.*, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935); *H. P. Hood & Sons v. Du Mond*, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951); *Polar Ice Cream & Creamery Co. v. Andrews*, 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964); *Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976).

mont. Plaintiff markets milk which it transports for sale in the State of Connecticut by a Connecticut-licensed dealer. The defendant, the Commissioner of the Connecticut Department of Agriculture (the "Commissioner"), is charged by statute with "the power to investigate and regulate all phases of the milk industry in this state . . . . ." Conn.Gen.Stat. § 22–206.

Plaintiff's constitutional attack is focused principally upon two components of the Connecticut statutory framework governing the regulation of milk. Section 22–172 of the Connecticut General Statutes requires milk producers intending to have their milk distributed in Connecticut to register with the Commissioner. It mandates that milk for public sale be dispensed only if the producer has secured the requisite permit.[2] Section 22–175 provides for regular inspections of all dairy farms and dairy plants from which "fluid milk" is shipped to dealers for sale in Connecticut. The state bears the expense of all such inspections, "whether within or without the state."[3]

Plaintiff, whose associated dairy farms are also subject to inspection by Vermont officials, contends that no legitimate public health interests are served by what it regards as essentially duplicative Connecticut inspection procedures. Further, assuming *arguendo* that some health interests are advanced, plaintiff submits that the Connecticut statutory scheme imposes burdens upon interstate commerce which are excessive in relation to any local benefits. Finally, plaintiff argues that the Connecticut laws discriminate against interstate commerce, both by design and in their practical effects. Accordingly, plaintiff seeks a declaration that the actions of the Commissioner, in requiring members of NFO to submit to Connecticut inspections in order lawfully to distribute milk products for sale in Connecticut, constitute an unconstitutional burden upon the free flow of interstate commerce, in violation of Article I, Section 8 of the United States Constitution. Because this action "arises under the Constitution"

**2.** Conn.Gen.Stat. § 22–172, as amended in 1979, provides:

Any person, firm or corporation engaged in the production of milk in Connecticut, which milk or the products thereof are to be used or disposed of elsewhere than on the premises where such milk is to be produced, and any person, firm or corporation engaged in the production of milk outside Connecticut for sale within Connecticut, shall register with the commissioner of agriculture in a manner prescribed, and on forms furnished, by the commissioner. Such registration shall be renewed annually during the month of January. Milk shall not be used, sold or disposed of away from the dairy farm located in Connecticut without a permit from the commissioner. Milk shall not be used, sold or disposed of away from the dairy farm located in Connecticut without a permit from the commissioner. Milk shall not be sold directly or indirectly into Connecticut from a dairy farm located outside Connecticut without a permit from the commissioner. Such permits shall be designated "Dairy Farm or Milk Producer Permit" and may be suspended or revoked by the commissioner for cause. The commissioner shall furnish copies of dairy farm permits or a certified list thereof to be kept on file by the dairy plant or milk dealer. Failure of any Connecticut person, firm or corporation to comply with the provisions of this section, subsection (a) of section 22–173, and sections 22–184 and 22–186 shall constitute a violation and shall be subject

to the penalty prescribed by section 22–203. When any out-of-state person, firm or corporation fails to comply with such provisions, the commissioner is directed to prohibit the distribution or sale of milk in Connecticut from such dairy farm or producing premises.

**3.** Conn.Gen.Stat. § 22–175 provides:

The commissioner shall inspect regularly and as frequently as possible the dairy farms and milk plants from which milk is regularly shipped to dealers within the state for sale therein in fluid form. He shall endeavor to maintain a sufficient number of dairy farms and dairy plants subject to regular inspections and approved for shipments of milk to be sold in fluid form in Connecticut markets so that consumers of the state may be assured of an adequate supply of fluid milk at all times. The commissioner shall have the right to inspect the producing dairy farm or the processing dairy plant and to sample the product of such dairy farm or dairy plant at any time or place. The expense incurred for the inspecting of any dairy farm, whether within or without the state, which produces fresh milk for daily use in this state shall be borne by the state. The expense incurred for the inspection of dairy farms and dairy plants which produce or process milk which is to be used for the production of cream for this state shall be borne by the cream source committee.

of the United States, the court has federal question jurisdiction under 28 U.S.C. § 1331(a).

With due regard for the submissions of plaintiff, the court cannot agree, after reviewing the pleadings, briefs and evidence offered at trial, that the Connecticut milk inspection scheme has been proven constitutionally infirm. No case which involves a delicate accommodation of disparate interests is amenable to some easy method of resolution by means of a mechanical balance. But based upon a careful review of this record, the court cannot say that a violation of the commerce clause has been established on these facts. Therefore, judgment shall be entered for the defendant.

## I. FINDINGS OF FACT

I find the essential facts to be as follows:

In order to sell milk for use in Connecticut, all milk-producing farms, including those affiliated with the plaintiff,[4] must obtain permits from the State of Connecticut, pursuant to Conn.Gen.Stat. § 22–172. To obtain and retain their permits, plaintiff's associated farms must undergo initial and periodic inspections by the Connecticut Department of Agriculture pursuant to Conn.Gen.Stat. § 22–175. Connecticut farms are subject to the same inspection procedures. The costs of inspection for all farms are borne by the State of Connecticut.

The National Conference of Interstate Milk Shipments ("NCIMS") is a cooperative organization comprised, *inter alia*, of representatives of the milk sanitation rating or enforcement agencies of the several states.[5] Based upon suggestions of the various state agencies, and with the aid of the United States Public Health Service ("USPHS"), the NCIMS promulgates recommended standards regarding the quality and purity of milk.[6] Documents published in cooperation with or in behalf of the NCIMS include "The Grade A Pasteurized Milk Ordinance" ("PMO"),[7] and "Procedures Governing the Cooperative State-Public Health Service/Food and Drug Administration Program for Certification of Interstate Milk Shippers."[8]

The PMO, which is drafted in the form of a model ordinance, sets out basic safety and sanitation guidelines for the dairy industry.[9] Though Connecticut, like Vermont, patterns a number of its milk sanitation requirements after those which are proposed in the PMO,[10] Connecticut imposes more rigorous inspection standards than does the PMO.[11]

To facilitate the interstate acceptance of milk on the basis of sanitation compliance and enforcement ratings, the NCIMS promulgates recommended uniform standards and procedures which may be used by inspection officers within the various states.[12] In consultation with the NCIMS, the USPHS cooperates with the states in a voluntary program for the certification of interstate milk shippers.[13] Lists of interstate milk shippers, together with the ratings of their supplies of milk, as certified by the states and validated by the USPHS, are published quarterly by the USPHS for the use, at their option, of the control authorities of milk importing states.[14] Just as the

---

4. Trial Transcript ("Tr.") 49–50.

5. Tr. 62–67, 76–81; U.S. Department of Health, Education and Welfare, Public Health Service/Food and Drug Administration ("HEW"), *Grade A Pasteurized Milk Ordinance: 1978 Recommendations* (Exhibit ["Ex."] 15).

6. *See* Ex. 15, *supra* note 5.

7. *Id.*

8. Ex. 19.

9. Ex. 15, *supra* note 5.

10. Tr. 415; Ex. 23 (Deposition of Donald George) at 9–10.

11. Tr. 415–16; Ex. 22 (Deposition of Alfred E. Janawicz) at 5–6.

12. Ex. 15, *supra* note 5.

13. Tr. 79–81; Ex. 15, *supra* note 5.

14. *See, e. g.,* HEW, *Sanitation Compliance and Enforcement Ratings of Interstate Milk Shippers,* HFF–215 at i (Notice of January 1, 1980) (Ex. 18); *see also* Ex. 16 (version of same publication, dated October 1, 1979); HEW, *Pro-*

use of such ratings by state officials charged with the duty of certifying milk producers is entirely voluntary, so too is participation in this rating program by milk producing farms.[15]

The NCIMS promotes a principle of reciprocity, whereby states may choose to accept the milk products of those producers who have achieved an acceptable sanitation rating as determined by the inspectors of another state in accordance with the NCIMS rating system.[16] While most states, including Vermont, adhere to the principle of reciprocity, several states, including Connecticut, do not permit NCIMS ratings by officials of other jurisdictions to serve as substitutes for their own sanitary inspections of out-of-state milk producers.[17]

As of December 30, 1979, approximately 1,862 out-of-state producers and 681 Connecticut milk producers were registered in Connecticut. Among the out-of-state producers registered in Connecticut were approximately 529 Vermont milk producers.[18]

Connecticut's milk inspection standards are generally more stringent than are those employed by Vermont. For example, while Vermont requires a tuberculosis inspection of cattle once within a four-year period, Connecticut requires an annual tuberculosis test.[19]

The various producing farms associated with NFO are registered in Connecticut.[20] When Connecticut first caused the NFO producing farms to be inspected, approximately one-half of the farms examined failed to pass the Connecticut inspections.[21]

## II. THE LEGAL FRAMEWORK

### A. The Appropriate Commerce Clause Test

As numerous Supreme Court decisions make clear, the standard for determining whether a state law violates the commerce clause is not a mechanical one. This court has the benefit of a recent Supreme Court decision which summarizes the interests which must be balanced in cases such as this. In *Lewis v. BT Investment Managers, Inc.*, —— U.S. ——, ——, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980), the Court noted that the commerce clause has long been viewed as a limitation upon the "power of the States to erect barriers against interstate trade." However, the Court also observed that

> [t]his limitation upon state power, of course, is by no means absolute. In the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected.

*Id., citing Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 440, 98 S.Ct. 787, 793, 54 L.Ed.2d 664 (1978) and *Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 371, 96 S.Ct. 923, 927, 47 L.Ed.2d 55 (1978).

As the Court noted in *Lewis*, the exercise of the state's police power to regulate questions of legitimate local interest must be consistent with the "ultimate . . . principle that one state in its dealings with another may not place itself in a position of economic isolation." *Id., quoting Baldwin*

---

cedures Governing the Cooperative State-Public Health Service/Food and Drug Administration Program for Certification of Interstate Milk Shippers (1979 revision) (Ex. 19); Tr. 68–69.

**15.** *Id.*

**16.** *Id.; see also* Tr. 95–99.

**17.** *Id.* The parties to this action have represented that five states—Connecticut, Massachusetts, Louisiana, Nevada and New York—do not accept the principle of reciprocity. Plaintiff's Proposed Findings of Fact, ' 15 (March 31, 1980); Defendant's Proposed Find-

ings of Fact, ' 1 (April 17, 1980). The court's research indicates, however, that at least one of these states, Massachusetts, amended its laws as of January 4, 1978, to provide for reciprocity. Mass.Gen.L. ch. 94, § 16C.

**18.** Tr. 413; Ex. D.

**19.** Tr. 416, 438, 120; Ex. 22 (Deposition of Alfred E. Janawicz) at 5–6.

**20.** Tr. 414.

**21.** Tr. 230.

*v. G. A. F. Seelig, Inc.,* 294 U.S. 511, 527, 55 S.Ct. 497, 502, 79 L.Ed.2d 1032 (1935). The commerce clause prohibits overtly discriminatory state regulation:

> However important the state interest at hand, "it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently."

*Lewis v. BT Investment Managers, Inc., supra,* —— U.S. at ——, 100 S.Ct. at 2015, *quoting Philadelphia v. New Jersey,* 437 U.S. 617, 626–27, 98 S.Ct. 2531, 2536–2537, 57 L.Ed.2d 475 (1978). In *Philadelphia,* the Court stated that "where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected." 437 U.S. at 624, 98 S.Ct. at 2535.

■ However, where a state's regulatory statute "visits its effects equally upon both interstate and local business," *Lewis v. BT Investment Managers, Inc., supra,* —— U.S. at ——, 100 S.Ct. at 2015, a balance must be struck. That balance was described in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970), and was recently quoted at length and with approval in *Lewis* :

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and

on whether it could be promoted as well with a lesser impact on interstate activities.

*Lewis* teaches that "[t]he principal focus of inquiry must be the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects." *Lewis v. BT Investment Managers, Inc., supra,* —— U.S. at ——, 100 S.Ct. at 2016.

The Court proceeds to determine, on the basis of the evidence adduced at the trial of this action, whether the "practical operation" of the Connecticut statutes under attack here passes muster under the test summarized by the Court in *Lewis.*

#### B. The Test Applied

##### 1. The local health interest.

Plaintiff launches a frontal attack designed to show that no legitimate public health interests are promoted by the Connecticut inspection system. Pointing to the existence of proposed uniform safety and sanitation standards embodied in the PMO and promoted by the NCIMS, and claiming that Vermont inspection requirements are "in substantial conformity" with these standards, plaintiff contends that "[a]ny differences between the Vermont and Connecticut inspections programs are insignificant from a public health standpoint."[22] The court's threshold inquiry, then, is directed to the question whether the evidence establishes that the Connecticut regulatory scheme addresses local health concerns which cannot adequately be protected by reliance upon Vermont's farm inspection program.[23]

---

**22.** Plaintiff's Brief, pp. 6–7.

**23.** The court notes in passing that the area of health and sanitation standards for milk is not one in which a state enactment falls because federal law preempts the field. In the absence of a Congressional statement to the contrary, milk regulation has been held to be an appropriate subject of state regulation. *Dean Milk Co. v. City of Madison, supra,* 340 U.S. at 353, 71 S.Ct. at 297. Nor can it be contended that NCIMS standards—as they are embodied, for

example, in the model ordinance known as the PMO—have any preemptive legal effects *proprio vigore.* As its constitutive documents make clear, *see* Ex. 19, the National Conference of Interstate Milk Shipments is a voluntary organization. The testimony of plaintiff's witness, Mr. Ronald J. Herzberg, Senior Regional Milk and Food Specialist of the FDA, confirms that the NCIMS program is a "co-operative" one, not the "law of the land." Tr. 67.

Defendant points to several specific areas in which Connecticut's inspection regime is more rigorous than the one employed by Vermont or recommended in the PMO. Testimony was introduced regarding Connecticut's opposition to "wooden crossovers," devices used to cover barn gutters which contain manure; its disapproval of natural water sources, such as ponds or lakes, which might suffer contamination; and its concern with "added water," which can adulterate milk when pipelines are improperly flushed. These features of the Connecticut safety program, though not negligible, are arguably of relatively minor significance.[24]

The court attaches greater weight to the evidence on testing for tuberculosis. As one condition for obtaining a permit under section 22–172, Connecticut requires an annual tuberculosis test for milk-producing cows.[25] Vermont, in contrast, only requires a single test within a four-year period. Testimony by the defendant's expert witness, Dr. Franklin M. Foote, established that, though the incidence of tuberculosis has been substantially reduced in recent years, cattle remain subject to infection and may transmit the organism to milk.[26] Moreover, while pasteurization is generally effective in destroying pathogenic organisms, neither it nor the phosphatase test by which milk is sampled for disease-causing organisms are foolproof. Even accepting as a fact that there were no confirmed cases of bovine tuberculosis in Vermont for at least 10 years prior to October 14, 1977 (which the defendant does not dispute), it does not follow that additional testing by Connecticut is superfluous. As plaintiff's own witness, a Senior Milk and Food Specialist with the Food and Drug Administration, commented regarding the annual inspection program, "[n]aturally, the more testing you do, the better the chances are that you're going to have a better product."[27] The PMO itself notes that "the reservoir of bovine tuberculosis still exists," and emphasizes that "constant vigilance against this disease must be continued by industry and health agencies."[28]

A state's residual power to regulate commerce "is particularly strong when the State acts to protect its citizenry in matters

24. There is some dispute reflected in the evidence regarding each of the aforementioned factors. For example, while it is clear that Connecticut disapproves of the use of wood as a material for constructing gutter covers, it is arguable that Connecticut itself does not attach any overriding health significance to this requirement. For while the detection of wooden crossovers constitutes a ground for disapproval of a farm at the time it is initially inspected, Connecticut simply assigns a debit of two points out of one hundred if such devices are discovered upon reinspection. Tr. 508–509. As to water used for various purposes by producing farms, it would appear that Connecticut is somewhat stricter in excluding natural water sources, such as lakes or ponds, Tr. 417, while there is some indication, albeit an ambiguous one, that Vermont may sometimes allow such water sources under a so-called "grandfather clause." Tr. 509. Finally, as regards "added water," testimony established that on one occasion milk originating at five plaintiff farms was found to have been adulterated with water used to clean milk pipelines, a fact having undubitable health implications. But the significance of this incident is somewhat attenuated by the fact that it was probably plaintiff's own testing that brought the added water to the attention of Connecticut; in any case, on cross-examination, the Commissioner could not say that Connecticut itself routinely tests for the presence of added water. Tr. 494 95.

25. Section 22 133–113a(b) of the Regulations of Connecticut State Agencies provides, in pertinent part: "Each animal in the herd shall be tested yearly for tuberculosis." This regulation also provides that any bovine animal suspected of tuberculosis "shall be quarantined on the premises," and shall remain quarantined until it "no longer exhibits a positive response to tuberculin tests." *Id.*

26. Tr. 437. Tuberculosis is one of the diseases that "may be transmitted to man through the medium of milk." Ex. 15 at 83.

27. Testimony of Ronald J. Herzberg, Tr. 120. At another point, Mr. Herzberg testified as follows on cross-examination:

"Q. What is your opinion of a state that might have higher standards that the Interstate Milk Shippers [sic] guidelines might set forth?
A. I believe in some areas I'm on record with our people in Washington as having asked for higher standards myself."
Tr. 112–13.

28. Ex. 15, at 83.

pertaining to the sale of foodstuffs." *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 350, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977); *cf. Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 144, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963) (supervision of foodstuffs for the market "has always been deemed a matter of peculiarly local concern"). The decision by Connecticut to impose sanitation requirements which are stricter than those employed in Vermont involves a legislative decision as to costs and benefits; it is the sort of considered judgment which traditionally falls within the purview of the state when the subject addressed is one of legitimate local concern. Upon due consideration of the evidence adduced, I conclude that the Connecticut inspection program is designed to serve *bona fide* and substantial health interests.

### 2. *The question of discrimination.*

A finding that legitimate health interests are addressed by the statutory scheme does not terminate the court's inquiry, however. Legitimate local purposes having been found, *see Pike v. Bruce Church, Inc., supra,* 397 U.S. at 142, 90 S.Ct. at 847, "the question becomes one of [the] degree" to which the legislation burdens interstate commerce. *Id.*

■ It is well established that "the state may not use its admitted powers to protect the health and safety of its people as a basis for suppressing competition." *H. P. Hood & Sons v. Du Mond, supra,* 336 U.S. at 538, 69 S.Ct. at 665. Putative concern for the health of local consumers may not be used as a subterfuge to mask an overriding concern for the economic health of local producers. In *Great Atlantic & Pacific Tea Co. v. Cottrell,* 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976), for example, a Mississippi enactment which proscribed the sale of out-of-state milk unless the state of origin accepted Mississippi milk on a reciprocal basis was defended as a legitimate health measure. In striking down the law, the Supreme Court dismissed the health argument as bordering on the frivolous, since the reci-

procity clause would permit entry of out-of-state milk regardless of the quality standards under which it was produced. Suggesting that if its real concern were health, "Mississippi has the obvious alternative of applying its own standards of inspection to shipments of milk from a nonreciprocating State," *id.* at 377, 96 S.Ct. at 931, the Court viewed the challenged statute as an economic trade barrier erected under the guise of a health regulation.

Similarly, in *Dean Milk Co. v. City of Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951), the Court struck down a local regulation of milk processing as discriminatory. Madison, Wisconsin had passed an ordinance requiring that all milk for sale in the city be pasteurized within a five-mile radius of the downtown area. Plaintiff, an Illinois milk firm, challenged the ordinance, pointing to its practical effect of excluding from Madison all milk produced and pasteurized in Illinois. In thus serving to protect a local industry against out-of-state competition, the ordinance was found to "discriminate" against interstate commerce. *Dean Milk Co. v. City of Madison, supra,* 340 U.S. at 354, 71 S.Ct. at 297. The Court held that in the face of its burdensome effect, the regulation could not be sustained unless no reasonable nondiscriminatory alternatives were available.

> To permit Madison to adopt a regulation not essential for the protection of local health interests and placing a discriminatory burden on interstate commerce would invite a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause.

*Id.* at 356, 71 S.Ct. at 299.

This case does not reflect the "clearest example" of discriminatory legislation, *i. e.,* "a law that overtly blocks the flow of interstate commerce at a State's borders." *Philadelphia v. New Jersey, supra,* 437 U.S. at 624, 98 S.Ct. at 2535. This statutory scheme is neutral on its face, containing no special provisions which would by their terms exempt Connecticut milk products as a class from the rigors of inspection. Its application is evenhanded, *see South Caroli-*

na State Highway Department v. Barnwell Brothers, Inc., 303 U.S. 177, 189–90, 58 S.Ct. 510, 515–516, 82 L.Ed. 734 (1938), as evidenced by the uncontradicted testimony to the effect that once they are undertaken, Connecticut inspections are conducted in a nondiscriminatory manner, without regard to whether the producing farms are located in-state or out-of-state.[29]

Of course, discrimination need not be blatant to be objectionable. "The commerce clause forbids discrimination, whether forthright or ingenious. In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce." Best & Co. v. Maxwell, 311 U.S. 454, 455–56, 61 S.Ct. 334, 335, 85 L.Ed. 275 (1940). See also Lewis v. BT Investment Managers, Inc., supra, —— U.S. at ——, 100 S.Ct. at 2016.

One type of discriminatory legislation, illustrated in milk cases such as Great Atlantic and Pacific Tea Co. v. Cottrell and Dean Milk Co. v. City of Madison, supra, is a state or municipal enactment which has the practical effect of excluding all out-of-state supplies of the regulated product. It is clear that the Connecticut scheme has no such wholesale exclusionary effects. The evidence established that, at the end of 1979, a total of 2,543 producers were registered in Connecticut; of this number, Connecticut farms represented 681 registrations, Vermont 529, New York 1,112, Massachusetts 196, and New Hampshire 25. Thus, in toto, 1,862 out-of-state producers were licensed to ship milk for sale into Connecticut as of December 30, 1979.[30] Nor has the plaintiff proven that the Connecticut registration and inspection system serves substantially to raise the costs of marketing Vermont milk in Connecticut, strips away natural competitive or economic advantages of Vermont producers, or has leveling effects which insidiously operate to the advantage of local milk producers. See Hunt v. Washington Apple Advertising Commission, supra, 432 U.S. at 351, 97 S.Ct. at 2445.

This is not to say that the Connecticut statutory scheme is entirely unproblematic. The court must consider a regulatory program in the details of its application and as measured by its total impact upon the regulated parties. Pike v. Bruce Church, Inc., supra, 397 U.S. at 144, 90 S.Ct. at 848. Under such scrutiny, two features of the Connecticut system require further investigation for potential differential effects upon out-of-state producers: evidence of delayed inspections and the statutory provision for suspension of the inspection process.

Plaintiff introduced testimony regarding the waiting period between the time that a Connecticut inspection is requested and the time it is conducted. One witness, the NFO "milk Chairman," testified that the delay "can go anywhere from a few days to two weeks, to sometimes over a month, which is not uncommon."[31] According to the manager of plaintiff's milk receiving station, "I've seen it go two months before we would get an inspector up."[32] Both of these witnesses also asserted that these delays have caused plaintiff problems in soliciting new producers. Because of the lack of any established time pattern, plaintiff is unable to assure potential members of a firm date by which representatives of the Connecticut Department of Agriculture will be available to perform inspections. Since milk cannot be stored for any appreciable period, potential candidates for NFO membership, faced with the possibility of delayed Connecticut inspections, may be discouraged from casting their lot with an organization which ships milk into Connecticut.

Plaintiff does not contend that these delays evidence bad faith, but suggests that limited manpower, travel distances, and the short supply and high price of gasoline may

**29.** Tr. 434, 468–69.

**30.** Exhibit D; Tr. 413–14.

**31.** Tr. 162.

**32.** Tr. 203.

be responsible.[33] The testimony of Paul Gotthelf, Acting Assistant Chief of the Dairy Division of the Connecticut Department of Agriculture, tends to confirm this point. Mr. Gotthelf testified that inspections are scheduled in accordance with the availability of inspectors in a particular area. Though no direct evidence on the point was tendered, one may reasonably infer that on logistical grounds alone Connecticut farms desiring milk permits are likely to receive more speedy inspections than their counterparts in Vermont.

The court is frankly troubled by the potential hardships which delayed inspections may work upon out-of-state milk producers. Yet the Supreme Court has itself suggested in dictum that the on-site inspection of distant milk sources may constitute a reasonable state endeavor, observing further that the "actual and reasonable cost of such inspection" might be charged to importing producers and processors. *Dean Milk Co. v. City of Madison, supra,* 340 U.S. at 354–55, 71 S.Ct. at 298. Here, in contrast, the costs of all inspections, both in- and out-of-state, are borne by Connecticut. While it is possible to speculate that Connecticut would be in a better position to expedite its out-of-state inspections if it charged the costs of such inspections to importers, such a system could pose additional problems of discriminatory economic effects upon distant producers, since these costs would in all probability be passed along to them. While the burden associated with delays must be cast into the ultimate balance, I view it, absent a showing of bad faith, as one of those effects of a regulatory scheme on interstate commerce which may be characterized as "only incidental." *Philadelphia v. New Jersey, supra,* 437 U.S. at 624, 98 S.Ct. at 2535–2536.

The second feature of the Connecticut statutory framework which warrants comment is a provision which sets out conditions under which the Commissioner is not required to approve or inspect additional farms. Conn.Gen.Stat. § 22–182 allows the Commissioner effectively to suspend the inspection process when the milk supply reaches specified levels.[34] While this law presumably applies to all potential producers, regardless of whether they are new Connecticut or non-Connecticut applicants, it poses special dangers of economic protectionism. As Justice Frankfurter observed,

. . . the denial of a license to enter a market because the market is "adequately served" imposes a disqualification beyond the power of the applicant to remove. In that respect the effect upon the free flow of commerce is more enduring than is the case where all that is required is compliance with a local regulation.

*H. P. Hood & Sons v. Du Mond, supra,* 336 U.S. at 571, 69 S.Ct. at 672 (Frankfurter, J., dissenting).

Were the court squarely presented with a case in which the Commissioner refused to authorize inspections of out-of-state farms because supplies were deemed to be "adequate," it would have occasion to subject the state's rationale to close scrutiny for discrimination. But that is not this case. While plaintiff has alleged that the Connecticut Department of Agriculture has cooperated with retail milk dealers by refusing to inspect additional farms, the record does not reveal a single instance in which the inspection of plaintiff's current

---

**33.** Plaintiff's Brief, p. 11; Plaintiff's Proposed Findings of Fact, ' 38 (March 31, 1980); Tr. 210–11.

**34.** Conn.Gen.Stat. § 22–182 provides:

The commissioner shall not be required to approve or inspect additional farms whenever he has ascertained, through his investigations or from reliable data made available to him, that the total quantity of milk included in the pool computation each month of the basic uniform price for all dealers regulated by the federal milk order applicable to Connecticut during the preceding month has exceeded the total quantity sold in fluid form by them by more than twenty-five per cent of whenever, if the preceding month is July or August, the total quantity of milk included in the pool computation each month of the basic uniform price for all dealers regulated by the federal milk order applicable to Connecticut exceeds by more than ten per cent the quantities sold in fluid form by them during such month.

or potential members was refused pursuant to a suspension of the approval process under Conn.Gen.Stat. § 22–182.

In support of his charge that "the Connecticut statutes impose very substantial burdens upon interstate commerce which are clearly excessive in relation to the putative local benefits,"[35] plaintiff's counsel cites effects which he claims are associated not only with the central inspection apparatus, but also with certain subsidiary components of the statutory scheme, including the provision for so-called "emergency permits" under Conn.Gen.Stat. § 22–178. Before turning to the consequences directly incident to on-site sanitary inspections, I will consider these associated effects.

Section 22–178 authorizes the Commissioner to issue temporary permits to "relieve hardship" upon application from any dealer whose supplies fall below indicated levels. Such temporary permits allow dealers to receive milk from uninspected producers, provided that the milk meets specified sanitary and nutritional criteria.[36] Plaintiff recounts incidents in which it was granted leave under section 22–178 to ship milk into Connecticut from farms that were neither inspected nor approved by Connecticut, and calls attention to hardships attendant upon revocation of these temporary permits. Plaintiff also suggests that the Commissioner can and has used the award of temporary permits as a lever to control the interstate milk market.[37]

The court cannot attach great weight to plaintiff's claimed expectation that Connecticut would make the use of section 22–178 "emergency" permits permanent. By statutory definition, these "temporary" permits are merely exceptions to generally applicable rules. Were it shown that the Commissioner used the temporary permit provision to manipulate the market to the advantage of local producers, or that the whole inspection system was so riddled with exceptions as to constitute a porous sham, my assessment would necessarily be different. But such testimony as plaintiff did adduce on the question of preferential use of these "emergency" permits was contested and subject to divergent interpretations. In the face of inconclusive and conflicting evidence, I am reluctant to resolve conflicts so as to cut against the legislative conclusion that temporary permits to relieve dealer shortages have some reasonable utility. *See Brotherhood of Locomotive Firemen & Enginemen v. Chicago, Rock Island & Pacific Railroad Co.*, 393 U.S. 129, 138–39, 89 S.Ct. 323, 327–328, 21 L.Ed.2d 289 (1968) (district court erred in resolving conflicts in evidence against legislature's conclusion regarding safety benefits associated with full-crew requirements for trains).

Plaintiff also assails Conn.Gen.Stat. § 22–180, which provides that a dairy farm shall lose its approved status and "shall revert to the status of a new producer" whenever its shipments to Connecticut markets are discontinued during certain specified periods of the year.[38] Plaintiff asserts that this

---

**35.** Plaintiff's Brief, p. 10.

**36.** Conn.Gen.Stat. § 22–178 provides:

Any dealer whose receipts of milk from his regular and approved sources are or will be less than one hundred six per cent of his current total sales of milk in fluid form may apply for relief and, if the commissioner cannot assist such dealer to procure an adequate additional supply of milk from sources already approved for shipments of milk to be sold in fluid form, the commissioner shall approve additional sources of regular supply or issue a temporary permit, including oral permission granted by telephone or otherwise, to relieve hardship for such dealer which will authorize such dealer to receive milk from sources which have not been approved for the shipment of fluid milk to Connecticut, provided such milk, upon arrival

at the dealer's plant in a Connecticut market, shall meet the standards pertaining to temperature and bacteriological, sediment, butter-fat and total solids content prescribed by this chapter for milk to be sold in fluid form in this state.

**37.** Plaintiff's Brief, pp. 12–15; *see, e. g.,* Tr. 375–80, 343–48.

**38.** Conn.Gen.Stat. § 22–180 provides:

Whenever shipments of milk to Connecticut markets from any dairy farm or receiving plant have been discontinued during those months of the year other than July and August, for a period of forty-five consecutive days, or during the months of July and August for a period of seven consecutive days, such farm or plant

requirement of continuous shipments deprives it of the opportunity to make profitable seasonal "spot-loading" agreements to market milk to areas of greatest demand with a premium in the form of an increased handling charge.[39]  Defendant responds that Connecticut expends valuable resources in conducting inspections, and "since Connecticut inspects those farms, it should be entitled to rely upon that source as a supply of milk for its market."[40]

In effect, the application of section 22–180 imposes an added cost upon producers who fail to ship milk to Connecticut for seven consecutive days in July or August, or for 45 days in other months.  However, it would be a mistake to identify this added cost with the loss of the extra handling charges associated with spot-loading sales, since producers are not precluded from concluding spot-loading agreements.  Rather, the "penalty" imposed upon shippers making discontinuous shipments is the need to begin the approval process anew.  Conn. Gen.Stat. § 22–181 provides:

> Any new producer, including one who has lost his approved status pursuant to the conditions set forth in section 22–180, shall make application to the commissioner for a permit at least three days prior to the time he desires to ship milk to a Connecticut dealer.

Thus, the cost of discontinuous shipments is equivalent to (but no greater than) the hardship represented by the need for an additional inspection.  Consequently, the court turns at last to the burdens associated with the inspections themselves; those burdens constitute the gravamen of plaintiff's complaint.

The actual conduct of the inspection process appears to have minimal disruptive effect upon plaintiff's producing farms.  One

Vermont dairy farmer, a Ms. Urie, when asked whether the presence of a Connecticut inspector causes any inconvenience, answered in the negative.[41]  Another of plaintiff's witnesses observed that "[t]he only inconvenience that the Connecticut inspection has ever caused me was the removing of the planks on my first original inspection," alluding to the fact that Connecticut disapproves of the use of wooden planking to cover gutters.[42]  Of course, to the extent that Connecticut inspections are in fact merely duplicative of Vermont inspections, as plaintiff asserts they are, one would not anticipate any significant added inconvenience inherent in the process itself, especially since testimony revealed that farmers often do not even accompany the inspectors on their rounds.  On the other hand, to the extent that Connecticut requirements are more stringent than those of Vermont, they subject producers to the risk of failure.  But such risks are an inevitable concomitant of more rigorous standards; the risks, in effect, are testimony to the non-redundant character of the Connecticut inspection procedures.  And the fact that about one-half of plaintiff's farms failed to pass their original Connecticut inspections shows that the risks are real.[43]

Plaintiff concentrates, however, upon the obstacles which the added Connecticut inspections present to their solicitation of new producers.  The court has already had occasion to note the problems of recruitment of new members which plaintiff claims are associated with the delays between initiation and consummation of the inspection process.[44]  The court does not discount these problems.  On the other hand, there is little evidence concerning the precise extent of the burden at issue here.  The only firsthand account of the effect of an inspection

shall lose its status as a farm or plant approved for shipments of milk to Connecticut markets and shall revert to the status of a new producer or plant, and the commissioner shall not then be required to continue to inspect such farm or plant.

**39.**  Plaintiff's Brief, pp. 15–16; see, e. g., Tr. 317–18, 361–62, 376–79.

**40.**  Defendant's Brief, p. 46.

**41.**  Tr. 146.

**42.**  Tr. 182.

**43.**  Tr. 230.

**44.**  See text supra at notes 31–33.

delay was by a farmer who was able to join the NFO organization after a month-long association with another milk handler. However, this witness had not herself requested a Connecticut inspection and could not state the length of the hiatus between the initial request and the completed. inspection.[45] Two other NFO employees testified that the need for additional inspections, or the waiting periods associated therewith, served to discourage applications and caused the loss of potential members. A third employee estimated that a 25 percent increase in the cooperative's milk supplies which might be brought about by the addition of new member-producers would yield a benefit (presumably per year) in excess of $10,000.[46] But the assumed 25 percent increase was a figure proposed by the examining counsel and is entirely speculative.

In sum, while the record warrants the conclusion that the challenged scheme may burden the plaintiff by producing some difficulties in the solicitation of new members, the precise scope and magnitude of that burden has not been established by the plaintiff.

### 3. Dixie Dairy *Distinguished.*

Before drawing up the final balance, a comparison of this case with *Dixie Dairy Co. v. City of Chicago,* 538 F.2d 1303 (7th Cir.), *cert. denied,* 429 U.S. 1001, 97 S.Ct. 531, 50 L.Ed.2d 612 (1976), is instructive. In *Dixie Dairy* the Court of Appeals for the Seventh Circuit sustained a commerce clause challenge to a Chicago ordinance which required out-of-state dairies and farm suppliers to submit to on-site inspections. Relying on the district court's finding that the Chicago inspection standards were "substantially equivalent" to those employed in Indiana, 538 F.2d at 1310, the court of appeals held that any putative local benefits were clearly outweighed by the burdens imposed upon commerce. *Id.* at 1311. Plaintiff submits that *Dixie Dairy*

"completely supports" plaintiff's position here, and urges this Court to "rely upon *Dixie Dairy's* application of the *Pike-Cottrell* balancing test in order to find that the Connecticut statutory scheme requiring duplicative inspections is an unconstitutional burden on interstate commerce." [47]

However, there are two crucial distinctions between *Dixie Dairy* and this case. In the first place, the trial court there had noted that "Chicago introduced no evidence whatsoever to indicate that the Indiana and USPHS inspection program is in any way inadequate." 538 F.2d at 1310 (quoting finding of the District Court). Indeed, the city had not even contended that Indiana inspection standards were *not* substantially equivalent to the Chicago standards. In contrast, in the case at bar the defendant has tendered a good deal of evidence to support the contention that Connecticut requirements are more rigorous than Vermont's, and that the difference is supported by public health justifications.

Secondly, even in the face of the burden produced by what it could only characterize as "duplicative" inspections, the Court of Appeals in *Dixie Dairy* observed:

> This burden might not appear to be excessive were in [sic] not for the evidence and findings showing that the actual effect of the duplicative inspection requirement has been that, with three arguable exceptions, no out-of-state processors held Chicago Board of Health milk permits.

538 F.2d at 1308. Here, as has already been noted, over 1800 non-Connecticut producers—as compared with less than 700 Connecticut suppliers—were licensed to sell milk in Connecticut as of the end of 1979.[48] This is clearly not a case in which out-of-state milk is unable to enter the local market.

*Dixie Dairy* is distinguishable, then, because (unlike this case) the legislation at issue there lacked any public health justifi-

---

**45.** Tr. 151.

**46.** Tr. 387.

**47.** Plaintiff's Reply Brief, p. 6.

**48.** *See* text *supra* at note 18.

**522**

cation and the effects it visited upon interstate commerce were incomparably more severe than those of the Connecticut statutory scheme.

### 4. *Balance of Burdens and Benefits.*

I have found that the Connecticut milk inspection scheme is nondiscriminatory, serves public health interests, and imposes certain burdens upon interstate commerce. As plaintiff points out, such burdens as do exist could be reduced or eliminated if Connecticut were to enter into a reciprocal inspection agreement with Vermont. Yet the Supreme Court has "not held that acceptance of offered reciprocity is required from other States . . .," *Great Atlantic & Pacific Tea Co. v. Cottrell, supra,* 424 U.S. at 379, 96 S.Ct. at 931 (citation omitted). Moreover, "not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States." *Id.* at 371, 96 S.Ct. at 929. The question is one of balance.

■ This is a case "[w]here the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental," *Pike v. Bruce Church, Inc., supra,* 397 U.S. at 142, 90 S.Ct. at 847. It follows that the Connecticut statutory scheme must be upheld "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* While the case is a close one, and the statutory scheme in some respects approaches the lines drawn in *Dean Milk v. City of Madison* and *Great Atlantic & Pacific Tea Co. v. Cottrell, supra,* the plaintiff has not sustained its heavy burden of establishing that the means chosen by Connecticut to advance its local interests violate the Commerce Clause.

### III. CONCLUSION

■ On the basis of the foregoing, which constitutes the court's findings of fact and conclusions of law, *see* Rule 52(a), Fed.R. Civ.P., I hold that this is not one of those cases—"few in number—where local . . measures that are nondiscriminatory place an unconstitutional burden on interstate commerce." *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 529, 79 S.Ct. 962, 967, 3 L.Ed.2d 1003 (1959).

Accordingly, it is ordered that judgment be entered in favor of the defendant and against the plaintiff.