**DIXIE DAIRY COMPANY, a corporation, Plaintiff-Appellee,**

v.

**CITY OF CHICAGO, a Municipal Corporation, et al., Defendants-Appellants.**

No. 75–1932.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 19, 1976.

Decided Aug. 6, 1976.

Rehearing and Rehearing En Banc Denied Sept. 2, 1976.

William R. Quinlan, Corp. Counsel, Edmund Hatfield, Asst. Corp. Counsel, Chicago, Ill., for defendants-appellants.

Francis J. McConnell, Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, SPRECHER and TONE, Circuit Judges.

TONE, Circuit Judge.

The issue in this case is whether a Chicago milk inspection ordinance imposes an unreasonable burden on interstate commerce, thereby violating the Commerce Clause, article I, section 8, of the Constitution. The District Court, after trial, entered a judgment holding the ordinance unconstitutional. We affirm that judgment.

Plaintiff Dixie Dairy Company operates a milk processing plant in Gary, Indiana, and sells the milk and milk products processed there to buyers in Indiana and Illinois. Dixie purchases its milk from 204 dairy farms, of which about half are in Illinois and half in Indiana.

In 1955 Dixie applied for a permit to sell milk in the City of Chicago. Forms were submitted on behalf of all of Dixie's producers and milk haulers, but no action was taken by the city. The company next inquired about the possibility of obtaining a permit in May of 1969. A Dixie representative was informed at that time by the city's chief sanitary officer that the city was in the process of updating its milk inspection ordinance, and that it would be "futile" to apply then.

Two years before Dixie's most recent inquiry, the State of Indiana enacted the Grade "A" Pasteurized Milk Ordinance (PMO) recommended by the United States Public Health Service (USPHS). Ind. Code § 16-6-6-1, et seq. (Burns Stat. 1973). The PMO has been voluntarily adopted by 45 states and many counties and municipalities in the United States. The Indiana statute embodying the ordinance requires all vendors of milk within the state to obtain a

permit from the Indiana State Board of Health. As a condition to obtaining and maintaining a permit, a distributor's processing plant, such as Dixie's, and all farms shipping milk to that plant are subject to inspection at least twice a year by the Indiana health authorities. Ind. Code §§ 16–6–6–3, –5. The District Court found that farms are actually inspected by the state three or four times a year, and that plants are inspected every week. In addition, the statute requires that each dairy farmer's milk be laboratory tested for bacteria a minimum of four times every six months. Ind. Code § 16–6–6–6. Bulk milk haulers, who transport milk from the farms to the processing plants, are also inspected three times a year, according to the District Court.

State rating officers certified by USPHS survey and rate milk producers and processors in every state which has adopted the PMO pursuant to the procedures and criteria set forth in a pamphlet entitled "Methods of Making Sanitation Ratings of Milksheds," USPHS Publication No. 678 (1966). Compliance with those criteria is determined according to a point system, with any compliance rating above 90 per cent being considered acceptable for interstate transport and consumption. Dixie's farmer suppliers are thus subject to two further inspections, one by USPHS-certified state rating officers, who inspect a random sample of each processor's farms to derive the USPHS rating, and another by USPHS agents, who check the results of

the survey for accuracy on a sample selection basis. Processing plants are also surveyed by state survey officers, whose results are audited by USPHS.

Section 11 of the PMO, adopted in substance as Ind. Code § 16–6–6–11, provides that milk "from points beyond the limits of routine inspection" may be sold within the enacting authority's jurisdiction if the milk has been produced and pasteurized under regulations substantially equivalent to the PMO and has been awarded an acceptable rating by a state milk sanitation rating officer certified by USPHS.[1] Thus duplicative inspections are avoided.

The State of Illinois, by regulation, has also adopted the PMO, including section 11. Ill. Dep't of Pub. Health, Grade A Pasteurized Milk and Milk Products Rules and Regulations, art. XI, rule 11.01. Dixie has a permit, issued pursuant to these regulations, to sell milk in Illinois. That permit, however, does not authorize Dixie to sell in Chicago, which, under the authority of Ill. Rev.Stat. ch. 24, § 11–16–1 (1975), maintains its own milk regulations and has not adopted the PMO.[2] Since 1934 the Chicago milk ordinance has required that all milk vendors obtain a permit from the Chicago Board of Health and that they and their suppliers submit to periodic inspections by the board's own inspectors. Chicago Municipal Code §§ 154–8, –17, –22. Because no effective provision is made for reliance upon inspections by out-of-state authorities,[3] an out-of-state processor seeking a Chicago permit is in effect required

1. Section 11 of the statute, unlike section 11 of the PMO, also contains a reciprocity proviso, which was held unconstitutional by a three-judge district court in *Dean Foods Co. v. State Board of Health of the State of Indiana,* No. IP 70–C–610 (S.D. Ind. July 7, 1971).

2. The District Court found, however, that while the PMO has not been enacted by the Chicago City Council, PMO inspection standards have been adopted informally by the Chicago Board of Health.

3. Section 154–19 of the Code provides:
 "*Products shipped from beyond limits.* Milk and milk products from points beyond the limits of inspection may not be sold in the city unless produced and pasteurized under

provisions identical with those of this chapter and approved by the board of health. In order that inspections by the board of health may be adequate, thorough, and effective, the board of health may confine its inspections within such points and territorial limits as the board of health may, from time to time, deem necessary to insure economic and proper supervision, and to safeguard and promote the public health of the city."
Trial testimony revealed, however, that Dixie and all of its suppliers are considered by Chicago authorities to be within the "limits of inspection." The Board of Health has interpreted section 154–19 as applying only to emergency situations.

by the ordinance to submit itself and its dairy-farmer suppliers to duplicative inspections by Chicago inspectors.

The record is silent on the question of whether Illinois processors who wish to sell milk both in Chicago and elsewhere in Illinois are, with their suppliers, subjected to duplicative inspections. At oral argument the question was disputed by assertions outside the record, which we must of course disregard. It would seem incongruous and unlikely that Illinois which, by adopting section 11 of the PMO, accepts inspections made by other states, would not do the same for Chicago, to whose inspectors it has entrusted the health of Chicago's 3.4 million people.[4] We shall, however, treat this point as unresolved by the record.

Dixie brought this suit in 1970, alleging in count 1 of its amended complaint that the city's refusal to issue a permit in the face of Indiana inspections and of the company's high USPHS ratings imposed an unconstitutional burden on interstate commerce. In count 2 Dixie alleged that the inspection and permit policy discriminated against interstate commerce, since the city refused not only to issue the permit but also to take the prerequisite step of inspecting Dixie's facilities. The city moved for summary judgment, which was granted as to count 1, in March 1973. While the suit was pending, Chicago Board of Health inspectors twice inspected Dixie's plant and pro-

ducer farms. After the second inspection tour, the city offered to issue a permit on the condition that it be entitled to make continuing inspections, at no charge to Dixie or its producers. As a result of this offer, the District Court granted the city's motion as to count 2 in June 1974. Dixie, adhering to its view that duplicative Chicago inspections were unnecessary, rejected the offer and appealed the count 1 ruling. This court reversed in an unpublished order and sent the case back to the District Court for resolution of disputed factual issues.[5]

On remand, the District Court found that at all times relevant to this action Dixie has received USPHS ratings of above 90 per cent for its plant and producers, that Dixie's milk is wholesome, and that "Chicago can rely upon Indiana and USPHS inspection to fully protect Chicago's health interests." The court noted that city officials had acknowledged as much, and the city had not contended otherwise. The court also found, in findings discussed in greater detail below, that the result of the duplicative inspection requirement of the ordinance was that no out-of-state processor has obtained a Chicago milk permit, and this result constituted an unreasonable burden on interstate commerce.[6] It therefore concluded that the city's refusal to grant milk permits except when conditioned upon Chicago Board of Health inspections was unconstitutional.

4. It is noteworthy, in this connection, that while, as we point out later in the text, no out-of-state milk processors hold Chicago permits, a number of Illinois processors have held permits for many years and at least one other has applied for and received a permit in the past two years. This is some indication that Illinois processors are not subjected, with their suppliers, to duplicative inspections, assuming that, as the District Court found, requiring duplicative inspections discourages processors from applying for Chicago permits.

5. Among the factual issues which this court found to be relevant were:

"whether the Chicago Board of Health by its administration of Chicago's milk ordinance has discouraged out-of-state milk producers and processors from applying for permits to sell Grade A milk products in Chicago; whether the Chicago Board of Health speedi-

ly and fairly inspects out-of-state milk producers without charge; and whether shelf inspection of Grade A milk products would adequately protect the health of Chicago residents."

6. An additional burden found by the District Court was the threat of retaliatory legislation by states and municipalities whose own producers are adversely affected. Since the only two instances of retaliatory legislation evidenced by the record have been found to be either unconstitutional, see *Dean Foods Co. v. State Board of Health of the State of Indiana,* supra note 1, No. IP 70–C–610, or contrary to state law, see *State ex rel. MTW, Inc. v. The City of Milwaukee,* No. 390–391 (Wis.Cir.Ct. Sept. 14, 1971), we attach no weight to this finding.

## I.

The count of the complaint in which discrimination against interstate commerce was alleged (count 2) having been dismissed and no appeal having been taken from that dismissal, the issue of discrimination was removed from the case and is not before us.[7] As we have noted, the record does not disclose whether Illinois processors and their suppliers are also subjected to duplicative inspections as a result of the ordinance. We therefore assume the ordinance to be nondiscriminatory and must decide only whether "[t]his is one of those cases—few in number—where local safety measures that are nondiscriminatory place an unconstitutional burden on interstate commerce." *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 529, 79 S.Ct. 962, 967, 3 L.Ed.2d 1003 (1959).

■ Before the formulation of the balancing test in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), and the reaffirmation of that test in *Great Atlantic and Pacific Tea Co. v. Cottrell,* 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976), the argument in favor of the constitutionality of the Chicago milk ordinance would have been more persuasive. The ordinance does not purport to discriminate against interstate commerce. *Cf. South Carolina Highway Department v. Barnwell Bros., Inc.,* 303 U.S. 177, 189, 58 S.Ct. 510, 82 L.Ed. 734 (1938). The policy decision and legisiative judgment underlying a state regulation designed to protect the public's health or safety are not subject to review by a federal court. *Brotherhood of Locomotive Firemen & Enginemen v. Chicago, R. I. & P. R. Co.,* 393 U.S. 129, 136, 138–139, 89 S.Ct. 323, 21 L.Ed.2d 289 (1968). The burden the ordinance lays on commerce is "incidental," see *e. g., Milk Control Board v. Eisenberg Farm Products,* 306 U.S. 346, 352, 59 S.Ct. 528, 83 L.Ed. 752 (1939), and not "direct," *Shafer v. Farmers Grain Co.,* 268 U.S. 189, 199, 45 S.Ct. 481, 69 L.Ed. 909

(1925). The ordinance is not inconsistent with regulations of other states in a field in which uniformity is important to the national interest in unimpeded commerce. *See Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 444, 448, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960); *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 770, 781–782, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). The added expense to interstate businesses of complying with the regulation would not justify a court in striking it down. See *Brotherhood of Locomotive Firemen & Enginemen v. Chicago, R. I. & P. R. Co., supra,* 393 U.S. at 139–140, 89 S.Ct. 323; *Bibb v. Navajo Freight Lines, Inc., supra,* 359 U.S. at 529, 79 S.Ct. 962.

In *Pike v. Bruce Church, Inc.,* however, Justice Stewart, writing for a unanimous Court, stated the standard which is to control cases such as the one before us:

"Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 443 [80 S.Ct. 813, 816, 4 L.Ed.2d 852]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." 397 U.S. at 142, 90 S.Ct. at 847.

That passage from *Pike* was quoted by Justice Brennan, also writing for a unanimous Court, in the recent *Great Atlantic and Pacific Tea Co. v. Cottrell, supra,* 96 S.Ct. at

---

**7.** Even if it were otherwise permissible to do so, therefore, we need not consider the city's motives for rejecting a 1969 proposal to empower the Board of Health to accept milk on a reciprocal basis, including Dixie's contention that the only opposition to the proposal came from labor unions which sought to protect jobs.

928. Justice Brennan introduced the quoted material with the following words:

"[T]he Court, if it finds that a challenged exercise of local power serves to further a legitimate local interest but simultaneously burdens interstate commerce, is confronted with a problem of balance . . . .."

█ Neither *Pike* nor *Cottrell* purported to change the law in this field, but from their restatement and distillation of that law emerges a balancing test which, if not inconsistent with, is at least a considerable refinement of, the approaches taken in *Brotherhood* and other cases. We must, of course, apply the rule as most recently stated by the Court and appraise the earlier holdings accordingly. The *Pike* test applies by its terms to evenhanded, *i. e.,* nondiscriminatory, regulations. Also, it appears that the test is to be applied even when the regulation is in the field of health or safety. In stating the test, the *Pike* opinion cites the *Huron Cement* case, which involved an ordinance to protect health, and while a distinction is recognized in *Pike* between health and safety regulations and economic regulations, the importance of that distinction seems to lie in the relative weight to be given the state interest when balanced against the burden on commerce. See 397 U.S. at 142, 143–146, 90 S.Ct. 844. Our conclusion that we are to apply the *Pike* balancing test even though a health measure is involved, but giving appropriate additional weight to the fact that the regulation is health-related, is consistent with *Procter & Gamble Co. v. City of Chicago,* 509 F.2d 69 (7th Cir. 1975), in which we applied that test while recognizing the need to reconcile it with the *Brotherhood* case. Thus, while we are not to make legislative judgments concerning the need for, or efficacy of, a health regulation we may nevertheless consider whether the burden on commerce is excessive in relation to the benefits flowing from the regulation, and whether the health interest could be protected as well by alternative means that would burden commerce less.

One more paragraph about the governing precedents is necessary. In *Dean Milk Co. v. City of Madison,* 340 U.S. 349, 354–355, 71 S.Ct. 295, 95 L.Ed. 329 (1951), and again in *Cottrell* the Supreme Court said that an acceptable alternative means of protecting the state's public-health interest was to make its own inspection of milk sources outside the state.[8] In *Cottrell,* however, the reference to this alternative is qualified. Mississippi could make its own inspection, said the Court, "[i]n the absence of adequate assurance that the standards of a sister State, either as constituted or as applied, are substantially equivalent to its own . . . .." 96 S.Ct. at 930. Unless this qualification was surplusage, it means at least that if such assurance of substantial equivalence is present, the alternative of making its own inspection may not be available to the state authority. Whether it is available, we believe, depends on the results of applying the *Pike* balancing test, which *Cottrell* indorses.

## II.

The burden imposed on interstate commerce by the Chicago milk ordinance lies in the duplicative on-site inspections to which both out-of-state dairies and their dairy-farmer suppliers are subjected. This burden might not appear to be excessive were in not for the evidence and findings showing that the actual effect of the duplicative inspection requirement has been that, with three arguable exceptions,[9] no out-of-state processors hold Chicago Board of Health milk permits. The court found as follows:

"Not one out-of-state processor holds a Chicago Board of Health permit. Mr. Meany [Chief Sanitarian for the Chicago

---

8. The *Dean Milk* opinion said the city could charge for these inspections, and this is repeated in *Cottrell.* 96 S.Ct. at 931. As noted above, Chicago offers to inspect at its own expense.

9. Three out-of-state plants hold Chicago permits. Dixie characterizes them as "branch plants owned by Chicago dairies," to which the city responds that one of them, Borden, is a national company with only a regional office in Chicago.

Board of Health] testified that while 25–40 inquiries are received from out-of-state processors each year, when told that the grant of a permit is conditioned upon Chicago Board of Health initial and continuing inspections, 'very few' follow through. None have been granted such a permit."

The court also found that a number of other out-of-state processors, like plaintiff, had tried to secure permits without incurring the burden of duplicative on-site inspections. When it became clear that only through such inspections could a permit be received, these applicants gave up. The court said:

"The evidence further discloses that a number of out-of-state processors have sought a permit to sell Grade A products in Chicago on the basis of their IMS [interstate milk shipper's] ratings of 90 or higher, the same as Dixie. These include applications by Kroger for its Livonia, Michigan, plant to supply ice cream to the Kroger stores in the Chicago market (PX 54B), Sealtest for its Milwaukee, Wisconsin, plant (PX 54C), Ryan Milk Company for its Murray, Kentucky, plant to supply half and half coffee creamers (PX 54D), Yogurt Master for its Jacksonville, Florida, plant to supply yogurt, sour cream and dips (PX 54E), Yami Yogurt for its Fort Worth, Texas, plant to supply yogurt (PX 54F), Chautauqua Malted Milk for its Mayville, New York, plant to sup-ply condensed skim to Borden's Chicago plant (PX 54G). All applicants had IMS compliance and enforcement ratings of 90% or higher. Yogurt Master had a plant rating of 99% and a producer rating of 94%. Yami Yogurt had a plant rating of 95% and a producer rating of 97%. When advised that a permit could only be issued on the basis of Chicago inspection of producer sources and the shipper's plant, the inquiries terminated."

That the reason for the failure of out-of-state processors to obtain permits has been the duplicative inspection requirement of the Chicago ordinance is an inference the District Court was entitled to draw, and the inference we ourselves would have drawn notwithstanding the paucity of direct evidence on this subject.[10] Dixie's president testified that he was afraid that many of Dixie's dairy-farmer suppliers would seek other outlets for their milk rather than submit to duplicative inspections. There is no similar evidence concerning the many others who made inquiries but did not pursue them, except that in some instances their interest appears to have ended when they were informed of the inspection requirement.[11] Any evidence concerning whether the farmers would have taken the feared action would necessarily have been speculative. There is no testimony in the record from any farmer, and such evidence as there is on this subject is not very satisfactory.[12] It can reasonably be inferred,

10. There was also evidence and a finding of delays in connection with the application process, but it does not relate to recent years and it relates only to Dixie.

11. This observation is based on our examination of the correspondence between the city's chief sanitary officer, James Meany, and a number of applicants, which, in at least three instances, appears to have terminated after the applicants were informed of the inspection requirements. [Distron, Inc. (PX 54C), West Side Dairy (PX 54C), and Yami Yogurt (PX 54F).] In numerous other cases the final item of correspondence is a letter from Meany requesting the applicant to arrange a meeting with his department for the purposes of discussing Chicago Board of Health regulations.

12. The District Court's finding that Chicago's insistence on making its own inspection "may cause producers serving Dixie to refuse to sell to Dixie" is apparently based on the testimony of two witnesses, Dixie's president and a "field man" who had worked for the company and who had been dealing with dairy farmers for some 25 years. The former testified that the additional inspections "might" cause farmers to sell their milk to competitors of Dixie instead of Dixie, although "I'm not saying it would happen, but it could happen." The field man testified that in his opinion, based on his conversation with "various producers," a majority of producers would find other outlets for their milk rather than submit to two inspections. A timely hearsay objection was interposed and overruled. The witness' testimony of a farmer's declaration as to his state of mind, offered only to prove that state of mind,

however, that, in view of the disastrous economic effect which failure to pass an inspection would have on a dairy farmer, he would much prefer to be subject to inspection by only one authority if he had a choice.

██ Out-of-state processors have not obtained Chicago permits, and therefore their milk has not entered the Chicago market. The District Court's finding that the reason for this is the duplicative inspection requirement imposed by the Chicago ordinance is not clearly erroneous.

### III.

Having considered the nature and extent of the burden on commerce, we turn to the factor to be balanced against that burden, *viz.,* the putative local benefits to be derived from the ordinance (*Pike, supra,* 397 U.S. at 142, 90 S.Ct. 844) and to the related question of whether the Indiana standards are substantially equivalent to Chicago's (*Cottrell, supra,* 96 S.Ct. at 930).

The District Court made detailed findings concerning the efficacy of the Indiana inspection program and the USPHS inspection and rating program:

"12. Dixie's milk was and is wholesome and Chicago can rely upon Indiana and U.S.P.H.S. inspection to fully protect Chicago's health interests.

"13. On the basis of the evidence and testimony before the Court, the Court finds that Dixie's milk is wholesome and that the standards and procedures adopted and enforced by the Indiana State

was not excluded by the hearsay rule. Fed.R. Evid. 803(3). No other objection to the testimony was interposed.

13. See also note 2, *supra.*

During their inspection of Dixie's producer farms, the Chicago inspectors found fault with producers' use of clear plastic tubing to convey milk from milking equipment attached to the cow to a storage tank, if the tubing had become clouded. The Indiana inspectors did not. All agreed, however, that black plastic tubing would be acceptable. The Chicago inspectors also gave demerits if the producer's wash-and-rinse vats were not made of stainless steel; the Indiana inspectors viewed this requirement as too harsh. The Indiana inspectors also failed

Board of Health and the U.S.P.H.S. are sufficient to fully and adequately protect Chicago's health interests. . . . Chicago introduced no evidence whatsoever to indicate that the Indiana and U.S.P. H.S. inspection program is in any way inadequate. Indeed, the evidence establishes that the Chicago Board of Health has adopted, as a matter of practice, the PMO standards and has urged the Chicago City Council to formally enact those standards into law."

The court also noted and credited testimony by responsible city health officials before a committee of the City Council to the effect that adoption by the city of an ordinance substantially the same as the PMO and permitting distribution in Chicago of milk and milk products produced and processed under substantially equivalent regulations would fully protect Chicago's health interest. The city has not disclaimed or disputed that testimony and has not contended in the District Court or here that the Indiana standards are not substantially equivalent to the Chicago standards [13] or that the Indiana inspections are not adequate.[14]

██ Thus, although the challenged ordinance is ostensibly designed to protect the public health, the record shows, and it is uncontroverted, that in fact the ordinance has no appreciable effect in promoting that interest. The public health goal of the ordinance has become little more than a fiction. Even giving *Brotherhood* the reading most favorable to the city, it does not require deference to a legislative judgment which is

to assess demerits for cattle drinking cups which were fed by submerged inlets, although such devices are not permitted by the model ordinance. None of these minor variances between the practices of the Chicago inspectors and the Indiana inspectors were serious enough to disqualify any producer.

14. The District Court also noted:

"In addition to reliance upon Indiana and U.S.P.H.S. inspection a receiving jurisdiction, such as Chicago, has the right to sample milk products from the delivery truck and immediately request a re-survey should it believe that the published survey results are inaccurate."

concededly without a substantial basis in fact. And applying the balancing test of *Pike* and *Cottrell,* "the burden imposed on . . . commerce is clearly excessive in relation to the putative local benefits," *Pike,* 397 U.S. at 142, 90 S.Ct. at 847, which are rendered negligible by the conceded presence "of adequate assurance that the standards of a sister State . . . are substantially equivalent . . ." to Chicago's, *Cottrell,* 96 S.Ct. at 930.

AFFIRMED.