**NATIONAL FARMERS ORGANIZA-
TION IRASBURG, Plaintiff-Appel-
lant,**

v.

**COMMISSIONER OF AGRICULTURE,
STATE OF CONNECTICUT,
Defendant-Appellee.**

**No. 975, Docket 82–7831.**

United States Court of Appeals,
Second Circuit.

Argued March 17, 1983.

Decided June 24, 1983.

Peter F. Langrock, Middlebury, Vt. (Donald C. Arbitblit, Langrock, Sperry, Parker & Wool, Middlebury, Vt., of counsel), for plaintiff-appellant.

Richard F. Webb, Asst. Atty. Gen., State of Conn., Hartford, Conn. (Joseph I. Lieberman, Atty. Gen., State of Conn., Hartford, Conn., of counsel), for defendant-appellee.

Before MANSFIELD, MESKILL and NEWMAN, Circuit Judges.

MANSFIELD, Circuit Judge:

The Irasburg, Vermont, unit of the National Farmers Organization ("NFO") appeals from a decision of the District of Connecticut, José A. Cabranes, *Judge,* upholding the constitutionality of all but one part of a Connecticut statutory scheme requiring the registration and inspection of dairy farms producing milk to be sold in Connecticut. The statutes were attacked by NFO as placing an excessive burden on interstate commerce in relation to the potential public health benefits that might be derived from them by Connecticut. An earlier decision of the district court had been remanded for further findings. *National Farmers Organization v. Commissioner of Agriculture,* 496 F.Supp. 509 (D.Conn.), *vacated and remanded by unpublished order,* 646 F.2d 561 (2d Cir.1980). We modify the judgment and in all other respects affirm.

The NFO is an organization of approximately 50 dairy farmers in the vicinity of Irasburg, Vermont, who market their milk jointly for resale through a Connecticut-licensed dealer to buyers in Connecticut. Connecticut is a net importer of milk, while Vermont is a net exporter. As of Decem-

ber 30, 1979, approximately 1862 out-of-state milk farms were registered as shippers to Connecticut, compared with 681 Connecticut farms registered there. 529 of the registered out-of-state producers were Vermont milk producers.

Regulation of the sanitation and flavor of milk sold in a state is primarily the responsibility of that state rather than of the federal government. Since milk has a potential for carrying disease, a producing dairy farm must be licensed and inspected by state authorities to assure that the farm is clean and that its methods for feeding and housing cows and for producing, transporting and storing milk meet requirements designed to minimize growth of harmful organisms and assure wholesome milk to consumers. State inspectors periodically examine each dairy farm's cows, buildings, vehicles, reload stations, processing plant, milking equipment, grounds, and the odor and temperature of stored milk.

The National Conference on Interstate Milk Shipments ("NCIMS"), a cooperative organization composed of representatives of the milk sanitation rating and enforcement agencies of all 50 states, has promulgated recommended milk production health standards to assure the safety and quality of milk, including acceptable levels of sanitation and milk quality, known as the Grade A Pasteurized Milk Ordinance ("PMO"). Most states have adopted a principle of reciprocity under which each state will accept another state's milk provided it receives an acceptable PMO rating from the originating state's inspectors. To assist the

operation of this voluntary program based on reciprocity the U.S. Public Health Service ("USPHS") publishes quarterly lists of interstate milk shippers and the PMO ratings of their milk as certified by the states and validated by the USPHS, and the Food and Drug Administration conducts bi-annual audits of milk shippers and state enforcement agencies to verify their enforcement of PMO requirements.

Vermont subscribes to this reciprocity program. Those of its dairy farmers who ship milk out of state must meet the PMO rating, submitting to two inspections per year by Vermont representatives. As noted, most states permit such in-state inspections and PMO ratings to serve as substitutes for their own sanitary inspections. Although Connecticut is a member of the NCIMS it does not accept milk from other states on a PMO reciprocity basis but requires out-of-state producers shipping milk to customers within its jurisdiction to meet its standards, which it enforces by its own inspections of farms supplying such milk. Under Connecticut law the Commissioner of that state's Department of Agriculture is vested with the power to investigate and regulate the production of milk sold in that state, and each dairy farm supplier, whether located inside or outside of the state, must register with and obtain a permit from the Commissioner, without which it is not allowed to sell milk in the state. Conn. Gen.Stat. § 22–172.[1] The Commissioner is required to inspect regularly all farms supplying milk for sale in the state. Conn.Gen. Stat. § 22–175.[2] These inspections are paid

---

1. Conn.Gen.Stat. § 22–172 provides in pertinent part:

"Sec. 22–172. Registration of Producers. Permits. Penalty. Any person, firm or corporation engaged in the production of milk in Connecticut, which milk or the products thereof are to be used or disposed of elsewhere than on the premises where such milk is to be produced, and any person, firm or corporation engaged in the production of milk outside Connecticut for sale within Connecticut, shall register with the commissioner of agriculture in a manner described, and on forms furnished, by the commissioner. Such registration shall be renewed annually during the month of January. Milk shall not be used, sold or disposed of away from the dairy

farm located in Connecticut without a permit from the commissioner...."

2. Conn.Gen.Stat. § 22–175 provides:

"Sec. 22–175. Inspection of dairy farms and milk plants. The commissioners shall inspect regularly and as frequently as possible the dairy farms and milk plants from which milk is regularly shipped to dealers within the state for sale therein in fluid form. He shall endeavor to maintain a sufficient number of dairy farms and dairy plants subject to regular inspections and approved for shipments of milk to be sold in fluid form in Connecticut markets so that consumers of the state may be assured of an adequate supply of fluid milk at all times. The commissioner shall have the right to inspect the

for by the state. Under Connecticut's "continuous shipment" statute, Conn.Gen.Stat. § 22–180,[3] if a licensed farm discontinues shipments into the state for certain periods of time during the year the Commissioner is not required to continue his periodic inspections of that farm; the farm reverts to the status of a new producer and must apply for a new permit. Rather than risk this penalty Vermont farmers complied with the continuous shipment requirement, at least until it was declared unconstitutional by the district court, forgoing profit opportunities elsewhere. Another Connecticut statute provides that the Commissioner is not required to inspect any additional farms when the total amount of milk sold in the state has exceeded certain levels. Conn.Gen.Stat. § 22–182.[4] However, Connecticut does not currently refuse inspections on the ground that it has an adequate supply of milk.

The Commissioner enforces Connecticut standards by having his own state inspectors periodically travel to and from Vermont where they inspect dairy farms shipping or seeking to ship milk to Connecticut for consumption, just as the Commissioner's representatives inspect Connecticut dairy farms. Each Vermont farm, before it will be issued a Connecticut permit, must be inspected by a Connecticut inspector.

Thereafter it must submit to such inspections twice a year, in addition to Vermont's own semi-annual inspections under the NCIMS rating program.

Connecticut contends that its inspection procedure advances the health of its citizens by imposing stricter sanitation standards on dairy farmers producing milk for sale in its state than those of Vermont. It points to its requirement that a dairy farm obtain its water supply from a spring or well meeting certain construction standards. It prohibits use of surface water by a dairy farm as a water supply, even if subjected to full-time disinfection, since surface water can in its view still be the source of contamination and disease. Vermont, on the other hand, does not expressly prohibit use of a surface water supply. However, there is no evidence of such use except hearsay to the effect that a very few Vermont dairy farms in the northern part of the state may be using surface water.

Connecticut monitors and makes follow-up enforcement inspections of dairy farms producing milk which is found as a result of laboratory testing and reports analyzed by the Dairy Division of the Connecticut Department of Agriculture to contain impurities such as a high leukocyte or bacteria count. Upon discovering such specific qual-

producing dairy farm or the processing dairy plant and to sample the product of such dairy farm or dairy plant at any time or place. The expense incurred for the inspecting of any dairy farm, whether within or without the state, which produces fresh milk for daily use in this state shall be borne by the state. The expense incurred for the inspection of dairy farms and dairy plants which produce or process milk which is to be used for the production of cream for this state shall be borne by the cream source permittee."

3. Conn.Gen.Stat. § 22–180 provides:
 "Sec. 22–180. Loss of status as approved farm or plant. Whenever shipments of milk to Connecticut markets from any dairy farm or receiving plant have been discontinued during those months of the year other than July and August, for a period of forty-five consecutive days, or during the months of July and August for a period of seven consecutive days, such farm or plant shall lose its status as a farm or plant approved for shipments of milk to Connecticut markets and shall revert to the status of a new producer or plant, and the commissioner shall not then

be required to continue to inspect such farm or plant."

4. Conn.Gen.Stat. § 22–182 provides:
 "Sec. 22–182. When approval or inspection of additional farms not required. The commissioner shall not be required to approve or inspect additional farms whenever he has ascertained, through his investigations or from reliable data made available to him, that the total quantity of milk included in the pool computation each month of the basic uniform price for all dealers regulated by the federal milk order applicable to Connecticut during the preceding month has exceeded the total quantity sold in fluid form by them by more than twenty-five per cent or whenever, if the preceding month is July or August, the total quantity of milk included in the pool computation each month of the basic uniform price for all dealers regulated by the federal milk order applicable to Connecticut exceeds by more than ten per cent the quantity sold in fluid form by them during such month."

ity problems Connecticut sends out a warning letter to the farmer involved, brings the problem to the attention of that producer's milk handler, and enforces its standards by conducting such follow-up inspection as may be necessary, along with discussions with the farmer, to correct the problem. When Connecticut representatives some years ago first inspected Vermont dairy farmers who were affiliated with the NFO, approximately one-half of those farmers failed to pass the Connecticut inspections.

The record fails to show that Vermont engages in such enforcement through follow-up inspections after monitoring discloses quality problems with respect to specific farms. Instead Vermont relies primarily on private milk handlers to screen the milk quality reports received from the laboratory, copies of which are sent to the state. Upon receiving a laboratory report that shows non-compliance by a dairy farm with sanitation standards, the milk handler is supposed to stop receipt of milk from that farm until further tests reveal that its milk is in compliance. However, there was testimony that the licensed milk handlers in Vermont do not have the personnel required to monitor and enforce Vermont's standards whereas the State of Connecticut does have such personnel and uses them for monitoring and follow-up enforcement through on-site inspection of farms whose milk fails to meet standards.

There is a substantial difference between the period of time Vermont and Connecticut farmers applying for Connecticut permits must respectively wait to obtain the initial farm inspection required for the permit. The Vermont farmer must usually wait up to five weeks after he requests a permit before it is issued whereas the Connecticut farmer waits less than two weeks. The reason for this disparity is geography and expense. Because Vermont farms are more distant from inspectors based in Connecticut than are farms in Connecticut, the Commissioner usually delays Vermont inspections until enough inspection jobs have accumulated to make visits to Vermont for inspection purposes economically feasible. Since fluid milk is perishable and cannot be stored for any appreciable period of time without spoiling, the effect of Connecticut's requirement of an initial inspection for a permit is to discourage new farm candidates from applying for membership in NFO. However, once a candidate is granted a Connecticut permit he faces no further delays attributable to inspection.[5] Aside from the initial delay, inspections by Connecticut of Vermont farmers shipping milk to Connecticut do not substantially inconvenience the farmers. A farmer is not required to accompany the inspector on his tour of the farm but may continue his regular chores.

In November 1976, NFO filed the present action against the defendants seeking a declaratory judgment that the latter's enforcement of Conn.Gen.Stat. §§ 22–172 and 22–175 against them violates the Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3. After a bench trial Judge Cabranes, in an opinion dated July 22, 1980, upheld the constitutionality of these statutes on the ground that the burdens imposed by the Connecticut inspection scheme upon interstate commerce were not excessive in relation to the local public health benefits sought to be protected by Connecticut, which represent a valid state purpose. 496 F.Supp. 509. In his opinion Judge Cabranes relied, among other factors, on Connecticut's requirement of an annual tuberculosis test, which is more stringent than Vermont's comparable requirement. Upon appeal we issued an unpublished order remanding on the ground that reliance on this latter requirement was error for the reason that the tuberculosis test was not carried out by Connecticut state inspectors or at Connecticut's expense but by agreement of the parties and would be continued even if the Connecticut inspection statutes should be outlawed. Accordingly, we directed the district court to make further findings on

---

**5.** Prior to Judge Cabranes' invalidation of Connecticut's "continuous shipment" statute, Conn.Gen.Stat. § 22–180, see *infra*, a Vermont farmer might be forced to apply repeatedly for initial permits, and face lengthy delays each time, if he failed to ship milk into Connecticut during certain periods.

whether the Connecticut inspection requirements were merely duplicative of those established by the NCIMS and used by Vermont inspectors or served an additional bona fide, substantial Connecticut public health interest.

Upon remand Judge Cabranes held a further bench trial and on October 5–6, 1982, filed detailed findings of fact and a decision holding unconstitutional Conn.Gen.Stat. § 22–180, the "continuous shipment" statute, on the ground that it places excessive burdens on interstate commerce and discriminates against Vermont farmers by unnecessarily forcing them to undergo a longer waiting period for a new Connecticut permit than that imposed on Connecticut farmers when they have failed to maintain continuous shipments of milk. The other statutes attacked, Conn.Gen.Stat. §§ 22–172, 22–175, and 22–182, were upheld. NFO appeals from the latter decision. The defendants do not appeal from the injunction against enforcement of Conn.Gen.Stat. § 22–180.

## DISCUSSION

The principles governing this appeal are well-settled. The Commerce Clause, U.S. Const., Art. I, § 8, cl. 3, limits the power of the states to impede the free flow of interstate commerce. *Hughes v. Oklahoma,* 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979); *Philadelphia v. New Jersey,* 437 U.S. 617, 623, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). However, the limitation is not absolute. "In the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 36, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). A state may not discriminate "against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently." *Philadelphia v. New Jersey, supra,* 437 U.S. at 626–27, 98 S.Ct. at 2537.

When a state statute attacked as burdening interstate commerce is defended as protecting a legitimate local interest rather than constituting "simple economic protectionism," *Philadelphia v. New Jersey, supra,* 437 U.S. at 624, 100 S.Ct. at 2535, we are instructed by the Supreme Court to apply a balancing test, as follows:

"Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit,* 362 U.S. 440, 443 [80 S.Ct. 813, 815–816, 4 L.Ed.2d 852]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

In determining whether the district court properly applied this test we are bound by its findings of fact unless clearly erroneous. Fed.R.Civ.P. 52(a).

■ The record is clear that Connecticut's inspection statute, Conn.Gen.Stat. § 22–175, does not, with one exception to be noted, discriminate against Vermont dairy farmers either on its face or as applied. Connecticut farmers are subjected to the same inspections as Vermont farmers and the cost of all inspections, in-state and out-of-state, is borne by the state. NFO, however, contends that the statute imposes an excessive burden on interstate commerce because it substantially duplicates the inspection requirements of the National Conference on Interstate Milk Shipments, which are employed by Vermont and accepted by all but a few states, of which Connecticut is one. Connecticut inspection of Vermont farms, it is argued, serves no useful purpose and places unnecessary burdens on milk shipments by Vermont farmers to Connecticut. Connecticut responds that its inspection standards are more rigorous than those employed by Vermont, that they thus serve the valid interest of protecting the health of Connecticut milk consum-

ers, and that the burden on interstate transfer of milk from Vermont to Connecticut is incidental and outweighed by the increased local health benefits. Although both the increased burden and the benefits resulting from the Connecticut inspection system appear to be very limited, we are persuaded that the burden imposed by Connecticut inspections on shipments from Vermont to Connecticut, with one exception, is not "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc., supra,* 397 U.S. at 142, 90 S.Ct. at 847.

The only substantial burden sustained by Vermont farmers as a result of Connecticut's inspection system is the additional delay encountered by those Vermont farmers initially seeking a permit under Conn.Gen. Stat. § 22–172, as compared with that experienced by Connecticut farmers requesting such a permit.[6] The Vermont applicant must wait three or four weeks longer than the Connecticut applicant for the inspection needed to obtain a permit. Because of the perishable nature of milk, which cannot be stored for such a long period, Vermont farmers are inhibited by the prospective loss occasioned by this delay from joining NFO, an organization that would help them in marketing their milk in Connecticut, and thus they are prevented from increasing their potential markets for efficient shipment of milk. In its original opinion filed July 22, 1980, the district court expressed itself as "frankly troubled by the potential hardships which delayed inspections may work upon out-of-state milk producers." Indeed these delays were, ironically, the major reason asserted by Judge Cabranes for holding unconstitutional the "continuous shipment" statute, violation of which required the farmer to seek a permit anew.

The district court concluded, however, that this additional burden on Vermont farmers was not excessive, in view of the health benefits to be gained from the Connecticut standards which the court found to be more rigorous than those employed by Vermont. Connecticut inspections were found to be more health-protective in two respects: (1) Connecticut prohibited use of surface water as a supply, and (2) it coordinated its inspections with procedures used to monitor the quality of test samples of milk received from Vermont farms. The district court's heavy reliance upon Connecticut's prohibition against use of surface water supply, however, appears to be unsupported by record evidence and contrary to the court's initial views based on the identical proof.

The undisputed evidence shows that the PMO standards, as enforced in Vermont and Connecticut, require a farm to have a "protected" water supply, which would permit use of surface water provided the farmer subjects it to a safe water treatment process, including aeration, filtration and full-time disinfection. However, there is no evidence that any Vermont farmer has or uses an open water supply. Indeed the witness relied on by the district court, a Connecticut inspector (Upton), testified that he had never seen a Vermont dairy farm with an "unprotected" water supply in some 13 years of inspection in Vermont but that he had been "told" there were "several" near Lake Champlain.

The district court, in its original July 22, 1980 opinion described this evidence as an "ambiguous" indication that Vermont may sometimes allow use of such water sources but concluded that it was "arguably of relatively minor significance." Upon our remand of the case for further findings, the district court took no further evidence regarding possible use of surface water supply by Vermont farmers. However, its earlier dependence on tuberculosis testing, to which it had attached "greater weight," having been rejected by this Court as a health justification for Connecticut inspections, the district court relied heavily in its October 5, 1982 findings on Connecticut's prohibition against open water supplies as justifying Connecticut's inspections. In

---

6. NFO's claim that it suffered excessive freight costs as a contributor of milk to the supply for the Northeast region, based on Connecticut's non-inspection of Maine dairy farms, was rejected by the district court because of NFO's failure to adduce any competent and relevant evidence that Connecticut refused to inspect Maine farms. Absent evidence that this finding was clearly erroneous, it must stand.

view of the lack of supporting proof, this conclusion must be rejected. But even if there were adequate evidentiary support it would not justify the additional delay suffered by Vermont farmers initially seeking a Connecticut permit if the health benefit "could be promoted as well with a lesser impact on interstate activities," *Pike v. Bruce Church, Inc., supra,* 397 U.S. at 142, 90 S.Ct. at 847. Since the only record evidence on the subject indicates that surface water is rarely if ever used by Vermont farmers, Connecticut's health objective could be achieved, at least as far as initial inspections for permits are concerned, by the less burdensome alternative of simply obtaining a certificate from Vermont authorities that the applicant does not use an open water supply. This would relieve Vermont farmers applying for permits from the burden of unnecessary delay suffered in obtaining issuance of a Connecticut permit.

The district court, in concluding that the burden on Vermont farmers is justified by the health benefits from Connecticut inspections, next found that four annual inspections of Vermont farms (two by Vermont and two by Connecticut) are more likely to uncover sanitation or quality problems than two. Although this may be true, Connecticut requires only two inspections of its own dairy farms, and its imposition of two more on Vermont farms without evidence of greater necessity amounts to discrimination against them, which cannot be relied upon as a valid basis for its out-of-state inspection program.

The single ground upon which Connecticut's inspection procedure appears to be justified as producing greater health benefits and protection is its coordination of its review and analysis of laboratory tests of milk samples from Vermont farms with its inspections as a means of remedying sanitation problems discovered as a result of monitoring. There is ample record evidence of the effectiveness of this follow-up enforcement procedure which is used when substandard or abnormal milk is discovered. Vermont, on the other hand, does not usual-

ly itself do the monitoring essential to the procedure but relies on milk dealers who do not have sufficient personnel to do the job.

The additional health benefits from Connecticut's coordination of its inspections with its monitoring of laboratory test results, however, are realized only *after* a permit has been issued. Connecticut does not perform an initial inspection of a dairy farm unless that farm's milk has passed the applicable laboratory tests, and thus Connecticut would never have occasion, on an initial inspection, to investigate the source of unsatisfactory test results. As the Connecticut Attorney General has informed us, "The [initial] inspection which is conducted is *not* based on the laboratory tests and the department's analyses of same." Letter from Joseph I. Lieberman, Attorney General of Connecticut, June 15, 1983, at 2 (emphasis in original). The benefits of Connecticut's coordinated program of monitoring and inspection, therefore, cannot be balanced against the burden faced by the Vermont applicant in waiting up to five weeks for the inspection needed for a permit. There is no evidence that Connecticut's initial inspection differs from the Vermont inspection.[7] Indeed, the initial Connecticut inspections appear to be duplicative and made for the purpose of determining whether the applicant has a satisfactory PMO rating. Since that rating has already been obtained by the applicant as a result of Vermont's earlier inspection, the delayed duplicative initial Connecticut inspection does not warrant discriminating against the Vermont applicant in favor of the Connecticut applicant. *Dixie Dairy Co. v. City of Chicago,* 538 F.2d 1303 (7th Cir.1976). In the absence of any proof that the initial Connecticut inspection is more stringent or offers greater putative benefits than the earlier Vermont inspection of the same farm, the burden on Vermont shipments to Connecticut is excessive and in violation of the Commerce Clause. *Pike v. Bruce Church, Inc., supra; A & P Tea Co. v. Cottrell,* 424 U.S. 366, 367, 96 S.Ct. 923, 926, 47 L.Ed.2d 55 (1976).

---

**7.** The failure of some Vermont-inspected NFO Vermont farms to pass Connecticut's inspection some years ago is not relied upon as evidence that its inspectors are currently more rigorous than Vermont inspectors in applying the standards that are common to both states.

Since the initial Connecticut inspection for a permit is duplicative of the inspection already made of the same farm by Vermont, it must, because of the excessive burden it imposes, be considered separately from the later Connecticut inspections, which impose no burden on the Vermont farmer and provide Connecticut with the putative benefits of its superior monitoring-inspection procedure. Accordingly we uphold the constitutionality of the inspection statute, Conn.Gen.Stat. § 22–175, as applied except to the extent that it delays the initial issuance of permits.[8] A Vermont applicant is entitled to immediate issuance of a Connecticut permit upon showing that he has received a satisfactory PMO rating based on a Vermont inspection and does not use surface water.

 NFO's attack on the "adequate supply" statute, Conn.Gen.Stat. § 22–182, requires little comment. The contention, based on one or two isolated comments regarding the original intent of the statute, is that its purpose is to protect Connecticut dairy farmers against competition from out-of-state suppliers. Connecticut refused some years ago to inspect NFO farms without approval of their milk handler because it believed the agreement between NFO and its milk handler required such approval and not because it was attempting to regulate the supply of milk. We agree with Judge Cabranes that the evidence offered by NFO does not constitute "persuasive evidence that the Commissioner refuses to inspect out-of-state farms because of the existence of an adequate supply of Connecticut milk, or has refused to do so, at any time relevant to this lawsuit." On its face the statute is non-discriminatory. Absent evidence that it is applied at all, much less in a discriminatory fashion, we affirm the district court's decision that it does not violate the Commerce Clause. Our affirmance, of course, is without prejudice to NFO's right to seek relief in an action based on a showing that the statute is applied by Connecticut in a discriminatory manner. No such showing has been made on the record before us.

## CONCLUSION

The judgment of the district court is modified to the extent that Connecticut may not apply Conn.Gen.Stat. § 22–175 to delay or withhold issuance of permits to Vermont applicants who do not use surface or open water and have received a satisfactory PMO rating on their last Vermont inspection. Proof of non-use of surface or open water may be made through a certificate from appropriate Vermont authorities. Such proof, together with evidence that the applicant has received a satisfactory PMO rating will entitle it to immediate issuance of a permit under Conn.Gen.Stat. § 22–172.

In all other respects the judgment of the district court is affirmed. The case is remanded to the district court for entry of a judgment consistent with this opinion. No costs.

8. NFO's contention that Connecticut's statute allowing shipment of so-called "emergency milk" from Vermont to Connecticut without inspection, Conn.Gen.Stat. § 22–178, provides a less burdensome alternative that Connecticut is obligated to apply in lieu of Conn.Gen.Stat. § 22–175 is rejected, substantially for the reasons stated by the district court.